CRINER *v.* RITCHIE.

4-8235                                              208 S. W. 2d 447

Opinion delivered January 26, 1948.

Rehearing denied March 8, 1948.

*C. M. Martin, Henry B. Whitley* and *J. R. Wilson*, for appellant.

*McKay, McKay & Anderson* and *Gaughan, McClellan & Gaughan*, for appellee.

GRIFFIN SMITH, Chief Justice. The case, like others of like nature coming from areas where unusual developments affect values, presents issues that have acquired importance because oil and gas have been found.

Fee ownership of approximately sixty acres, and the status of mineral and royalty deeds, are involved.

Prior to 1860 a plantation proprietor named Mack C. Smith owned Reason Criner—a slave set free by the Emancipation Proclamation of Jan. 1, 1863. The slave's son, John H., lived with his father on the Smith lands in 1886. Record ownership of the southwest quarter of the southwest quarter of section nineteen, township fifteen south, range eighteen west, (Ouachita County) was in George L. Ritchie in 1894 and so continued until the litigation from which this appeal comes, although there were tax forfeitures and redemptions which are in no sense controlling here. Ritchie's muniment of title was a deed from Creel Lumber Company, presumptively a corporation.

John H. Criner and his wife, claiming ownership—as the evidence in the case at bar discloses—cleared and improved the land the father said he owned, but through mistake erected buildings south of the line between sections nineteen and thirty. This encroachment extended 110 yards, and as projected east and west involves ap-. proximately ten acres. Title to the south half of the north half of the northwest quarter of section thirty was asserted by John H. Criner through purchase from Peter Todd (John's brother-in-law) in 1911. This is an irregular tract susceptible of description by metes and bounds only.

In February 1939 Criner and his wife, Mary, executed an oil and gas lease and a mineral deed to E. E. Scott and H. Andrews. By the terms of these documents only forty acres described as the southwest quarter of the southwest quarter of section nineteen were affected. Consideration was that the grantees should procure a decree quieting title in the grantors, or effectuate the same end by satisfactory means. The deed and lease were subsequently cancelled when it was judicially determined that consideration for their execution had failed. However, they were placed of record within two weeks after execution.

The suit resulting in cancellation, but broader in intended scope, was filed in November 1945 by J. C. Ritchie for himself and as attorney in fact for others. The decree was rendered December 10, 1946.

In September 1945 Ritchie, for himself and others he was authorized to represent, executed a deed conveying half of the mineral royalties pertaining to the southwest quarter of the southwest quarter of section nineteen, and the northwest quarter of the northwest quarter of section thirty. Within this area of eighty acres was all of the land claimed by Criner, either through purchase, adverse possession, or otherwise. V. S. Parham, to whom the deed was executed for a consideration of $4,000, claims to have been an innocent purchaser, and the Court so found. Others who joined in the intervention were parties to whom Parham had conveyed

certain interests. In finding that Parham and his grantees were protected, the decree vested fee title in Criner, subject to the outstanding rights.

The Ritchie interests have appealed from that part of the decree and from a finding that they should refund $3,000 representing the sum received from Parham—this for the benefit of Criner;—while Criner has appealed from the holding that the royalty deed is good.

In holding that Criner was entitled to the property, subject to the rights of Parham and his grantees, the Court considered testimony showing that prior to 1894 Reason Criner had "bargained" with Creel Lumber Company for the forty acres in section nineteen. A contract of some kind—the exact nature of which John Criner did not understand—was made between John's father and the Lumber Company, in consequence of which the ex-slave paid $50 in cash or its equivalent and owed $50 on the purchase price of $100. John testified that he agreed to pay this balance because his father was old; and he, (John) having but recently married, desired to utilize the property for home purposes. The Lumber Company is alleged to have executed bond for title.

Because title was in the Lumber Company when Reason Criner made the contract, and because the Lumber Company in November 1894 conveyed the property to George L. Ritchie, John Criner, according to his testimony, "made a deal" with Ritchie to assist in perfecting title. John Criner and his wife each testified that a deed was executed by Ritchie. It was never placed of record, and was lost. Neither could there be found the bond for title or any recorded entry relating to it.

By some process presumptively official (*Koonce* v. *Woods,* 211 Ark. 440, 201 S. W. 2d 748; *Deniston* v. *Langsford,* 211 Ark. 780, 202 S. W. 2d 760) the land was assessed in 1894 in the name of Ransom Criner and after having been sold for taxes in 1895 and bought by H. W. Myer, it was redeemed by John H. Criner. There was a penciled notation on the record of certificate of purchase indicating that it had been transferred to George L.

Ritchie.    Thereafter John H. Criner paid taxes until 1916.

Ritchie died in 1913, leaving an estate inventoried at more than $360,000.   March 21, 1913, George R. Gordon was appointed administrator.   He at once asserted claim to the so-called Criner land, had it assessed as property of the Ritchie heirs, and began paying taxes.   During the greater part of the ensuing period no question appears to have been raised regarding Criner's right to possession, as distinguished from ownership. The Ritchies now, however, contend that Criner was a tenant and paid rent.

J. C. Ritchie, who manages the Ritchie estate, was a resident of Ruston, La., in 1945.   On September 3rd V. S. Parham called upon him for the purpose of purchasing royalty interests attaching to the two 40-acre tracts, one in section nineteen and the other in section thirty, as heretofore mentioned.   Parham met Thomas Gaughan, an attorney of Camden, and asked his opinion regarding the Ritchie title.   Gaughan, it appears, had represented Tide Water and Seaboard Oil Companies regarding an oil and gas lease executed by the Ritchie heirs.

Gaughan informed Parham that when the question of ownership was raised he procured from Criner (then in possession) a disclaimer in affidavit form.   In this writing, dated March 18, 1938, Criner affirmed that he was renting the land and claimed no interest other than that of a tenant.   Parham and a friend—neither of whom was an attorney—examined Ouachita deed and mortgage records and found the conveyance of 1894 through which George L. Ritchie took from Creel Lumber Company. An abstracter's certificate was procured, showing that the Ritchies had paid taxes for the ten preceding years.

While the negotiations were pending Parham and his associate undertook to make a personal inspection of the land.   Parham testified that he was not familiar with the exact location, but entered a tract and made inquiry of an old Negro who identified himself as John L. Criner. He asked who owned the land (subsequently found to be

the property in litigation) and was told that it belonged to the Ritchies, but that he (Criner) rented. Parham then endeavored to procure from Criner a disclaimer of title. The Negro first agreed to the proposal, provided Parham could give assurance that he would not be disturbed in possession [as tenant] during the remainder of his life, and that a payment of $50 be made.

In the meantime the Ritchies had drawn a draft on Parham for the amount involved. After considering what Gaughan had told him and what Criner himself had said regarding tenancy, Parham concluded to complete the agreement and directed the bank to pay the draft drawn for the Ritchies by Gaughan. That night Parham called Ritchie by telephone and received assurance that Criner's possession would not be disturbed. The following day when Parham saw Criner, the latter refused to sign either a quitclaim deed or a disclaimer, explaining that his wife and son did not want the documents executed. Smead Stuart, who was with Parham when he talked with Criner, supported Parham's testimony.

We agree with the Chancellor that Criner's conduct in asserting he was merely a tenant mislead Parham, and that without assurances of non-ownership the draft would have been dishonored. Criner's mineral deed and oil and gas lease to Scott and Andrews, although recorded, were not in the line of title from Ritchie to Criner and were not constructive notice of Criner's claim. But even so, Criner at a later period told Parham he was only a tenant.

We are also of opinion there was sufficient evidence to sustain the Chancellor's holding that Criner either believed he held under a deed, and hence thought he was owner, or that relationships originally amicable had grown hostile as to the heirs. At least we are not willing to say the Chancellor erred in concluding that on the issue of a lost deed the evidence was clear and convincing. Oral evidence is in harmony with the record fact that for years the property was assessed in Criner's name. There is no showing that the legal status changed when Gordon, who no doubt acted honestly upon *prima facie* showings

made to him, caused tax receipts to be issued to the Ritchie estate.

The Chancellor thought that in addition to the deed, evidence of adverse possession preponderated. Although Criner's testimony in support of the deed goes only to the claim that it conveyed the southwest quarter of the southwest quarter of section nineteen, the undisputed evidence is that he mistakenly assumed that the south line of the forty acres was approximately 110 yards farther south. He took possession of the additional ten acres in good faith, believing it was his; and, acting with the same good faith, he erected buildings. Criner thought the irregular area of about ten acres later bought from Todd was immediately south of the property in section nineteen, when in fact the two strips in combination accounted for almost twenty acres in section thirty. The chancellor found that the penciled notation made on the ·recorded certificate of tax purchase was ''obviously'' unofficial, that it was made by some third person, and was not intended as evidence of an assignment or transfer to Ritchie.

In explaining why the disclaimer procured by Thomas Gaughan was executed in 1938, Criner testified that Gordon, as administrator, had asked him to sign it so that he (Gordon) could ''complete title to an oil and gas lease''. This testimony is somewhat corroborated by Richard K. Mason, a Camden attorney, who said that, seven or eight years before, George Gordon and John Criner came to his office and discussed some land about which there was a dispute. No papers or documents were shown him, and Gordon did most of the talking. Mason's memory was hazy regarding details, but the idea he got was that Criner was to make certain concessions, in return for concessions by Gordon (presumptively acting for the Ritchie estate). The purpose, seemingly, was to permit Gordon ''. . . to give a lease, or a mineral deed—whether it was surface or mineral rights I don't remember—and they [were in my office] not more than five or six minutes. . . . Something was said about a waiver or disclaimer, [but] I don't remember just [what], the words were. I believe I said, [addressing Criner],

'All right, John, if you sign that waiver it will put you out of court to any one who sees it'. And I believe I made the statement that Mr. Gordon would take care of him if he said he would''. Other facts and circumstances were considered, including payment of government agricultural benefits to Criner for a number of years.

We think that in view of all the testimony the Court did not incorrectly appraise the weight of evidence upon the one hand and its clear, cogent, and convincing nature upon the other; hence the decree is affirmed on appeal and cross appeal.

Mr. Justice McFADDIN did not take part in the consideration or determination of this case.